UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

          v.                      Cr. No.: 06-102 (JDB)

**ANDERSON STRAKER**

## MOTION TO SUPPRESS STATEMENTS

Defendant, Anderson Straker, by and through undersigned counsel, Steven R. Kiersh, does hereby move to suppress as evidence any and all statements attributed to him. This Motion to Suppress includes any statement allegedly made in Trinidad while in custody of Trinidadian authorities and any statements allegedly made to the F.B.I. while being transported from Trinidad to the United States for prosecution in the United States District Court for the District of Columbia.

## I. INTRODUCTION

In accordance with its obligations pursuant to Rule 16, the United States has provided defendant with an F.B.I. 302. In a letter dated January 18, 2008, The United States wrote to undersigned counsel and stated that "You have previously been provided with a copy of the F.B.I. 302 memorializing Mr. Straker's confession to the F.B.I." [1] The statement was allegedly provided on July 29, 2007 and was transcribed on July 30, 2007.

---

[1] Defendant believes that the F.B.I. 302 represents the only statement allegedly made by defendant to any law enforcement official outside of the country of Trinidad.

The F.B.I. 302 is the only memorialization of the statement purportedly offered by defendant. Defendant has not signed the statement that he is alleged to have made to the F.B.I., the statement is not in defendant's handwriting, and there are no audio or visual recordings of defendant offering a statement.

Defendant has also been provided with the following documents: a 3 page handwritten report evidencing a statement provided by defendant to the Trinidad & Tobago (hereinafter T/T) authorities on January 6, 2006; a 4 page typed version of the 3 page January 6, 2007 handwritten report; a second 3 page handwritten document evidencing a statement provided by defendant to the T/T authorities on January 7, 2006; and a 3 page typed version of the January 7, 2006 statement.

Defendant seeks suppression of all the statements identified in the preceding paragraphs. For the reasons that will be discussed further in this pleading, defendant submits that all of the statements are linked to one another, all of the statements were the product of duress and coercion, and that all of the statements were the product of a joint venture between the T/T authorities and the United States. The statements made in Trinidad were not preceded by necessary waivers and the statement made to the F.B.I. was involuntary and obtained in violated of defendant's Fifth Amendment privilege against self-incrimination.

## II. FACTUAL BACKGROUND

Anderson Straker was born on November 17, 1973 in Trinidad. He is the biological son of Denise Straker and Patrick Truman (defendant never met this person) and the adopted son of Winston Peters. He attended public schools in Trinidad and completed the equivalent of high school in Trinidad. Defendant has no criminal record

and has never been educated or trained in the American system of jurisprudence. Defendant is the father of four children and has always maintained full time and legal employment throughout his adult life. He was the main source of financial support for his wife and children in Trinidad.

      Balram Maharaj was kidnapped from the Mellow Moods Bar in Trinidad on April 6, 2005 by a group of armed men. He was transported to a wooded location in the countryside where he was held for a period of days while attempts were made to negotiate a ransom for his release. Mr. Maharaj died while in the custody of his captors. Following his death his body was dismembered and placed in a two large canisters that were subsequently recovered by a joint force of T/T and American law enforcement authorities.[2]

      Anderson Straker was arrested by T/T authorities and charged with the murder of Balram Maharaj on January 6, 2006. By that date, the F.B.I. was already involved in the investigation of the murder of Mr. Maharaj who was believed to be a citizen of the United States.[3] Defendant was interviewed by Inspector Abraham who was accompanied by P.C. Trotman and P.C. Huggins in the La Horquetta Police Station on January 6, 2006. There is no evidence that defendant was made aware of rights he had as a citizen of Trinidad or as person who was to be charged with crimes in the United States prior to commencement of the interview. At the conclusion of the interview, defendant declined the opportunity to sign the notes of the interview.

---

[2] The body parts of decedent were recovered on January 8, 2006 based upon information provided by Mr. Clarke who was one of the perpetrators of the kidnapping.
[3] Upon information and belief Special Agent Claus was involved in the investigation as of November, 2005.

Defendant was interviewed a second time on January 7, 2006 at the La Horquetta Police Station. This facility is located in Arima which is between defendant's hometown of Mayaro and the capitol city of Port of Spain. The interview was conducted by Cpl. Lucas with P.C. Abraham in attendance. Again, there is no evidence that defendant was made aware of rights he had as a citizen of Trinidad or as a person who was to be charged with crimes in the United States prior to commencement of the interview.

While defendant was being held at the La Horquetta station during the period of January 6 through January 8, 2006, he were denied any access to a telephone, did not have a single visitor, and was kept isolated in an empty cell with no mattress. In fact, members of defendant's family tried to visit him on several occasions during this period but were denied access. Defendant's Trinidadian attorney, Theodore Guerra, was able to see defendant On January 8, 2006 for half an hour. Mr. Guerra instructed defendant not sign any documents or speak with anyone.

On January 8, 2006, defendant was interviewed by Trinidadian Officer Lucas and three F.B.I agents at the La Horquetta police station. The interviewed was conducted late in the evening and defendant was not accompanied by counsel. Agent Claus was the primary questioner and all four men were armed. Defendant stated that he would not sign any documents and would not consent to an interview. Claus responded that he was a former military officer and was taking the case personally. He repeatedly pressed defendant to sign a waiver. Claus added that he would inform the grand jury of defendant's lack of cooperation and make sure they returned an indictment against defendant. Straker told Claus that he did not trust the F.B.I. and was then slapped in the mouth by Agent Claus. Mr. Starker responded by standing up and asked that he be

4

permitted to return to his cell. At that point, Officer Lucas, who was standing behind defendant, grabbed defendant by the neck and struck him two times in the head with a flashlight that he was holding in his hand during the entirety of the interview.

Immediately after the assault by Claus and Lucas, defendant repeated that he would not talk without the presence of counsel. Notwithstanding the protests of defendant, the agents continued to attempt to have defendant speak with them. Defendant's head was bleeding and his mouth was swelling in the presence of the agents for approximately an additional hour before he was taken back to his cell.

On January 8, 2006, after meeting with Mr. Guerra and after being assaulted, defendant was transported to Arouca and the Five Rivers police station which is approximately halfway between Arima and Port of Spain. It was at that location that defendant was formally charged with the murder of Balram Maharaj. Officer Lucas came to the police station and again tried to have defendant make a statement. At the time, defendant was seated on the ground handcuffed to the floor. Defendant again said he would not speak with Lucas and received no visitors that day. Defendant received no treatment for his head or mouth injury.

January 9, 2006 was the first scheduled court appearance for Mr. Straker. While en route from the police station to the court, defendant showed an inquiring police officer that his head and mouth were injured. Defendant was then told he could not enter the court and instead was taken to a medical clinic. Defendant was given a cursory evaluation and ordered to wear a face mask. All of this occurred while he was handcuffed.

On January 9, 2006, Anderson Straker appeared in a courtroom in Trinidad. He has a substantial lump on his head and Theodore Guerra represents to the court that Mr.

5

Straker was assaulted by an American police officer in the presence of local police. Mr. Guerra represented to the Court that he saw Mr. Straker the previous day and nothing was wrong with him. Guerra adds that his client now presents with a significant lump on his head and noted an objection to the treatment. Mr. Straker was also forced to appear before the court wearing a filter mask covering his nose/mouth. The local media erroneously reported that he was suffering from hepatitis. Given the notoriety of Mr. Straker in Trinidad and the highly publicized reporting of the murder of Mr. Maharaj, this caused great difficulties to Mr. Straker in his place of confinement. He was subjected to ridicule and scorn by other detainees and staff members of the facility in which he was being held and forced him into isolation at the facility.[4]

Following the court proceeding on January 9, 2006, defendant was taken to the Royal Jail on Frederick Street in Port of Spain. He was placed in a cell by himself because of his purported illness in a part of the jail that specifically houses seriously ill individuals. The cell did not have a mattress or toilet and there was feces on the floor. Food and water was not offered to the defendant until the next day.

Defendant's uncle was able to see him at the Royal Jail. Defendant informed his uncle that he had been assaulted and was being mistreated.

Defendant appeared in court in Trinidad on January 12, 2006. His counsel again raised a concern that defendant was suffering from blunt force trauma to his head. Mr. Straker was required to wear a face mask and filter and the media reiterates the erroneous report that he is suffering from hepatitis requiring isolation from all other detainees.

---

[4] Defendant's notoriety stems from his adoptive father who is a member of the Trinidadian Parliament. His father, Winston Peters, is also an extremely well known calypso singer, Defendant, who is known as Gypsy's son in Trinidad, was widely reported in the Trinidadian media as having been arrested and charged in the highly publicized murder of Mr. Maharaj.

6

While at court, defendant was separated from all other individuals and forced to sit underneath a stairwell until his case was called. The Magistrate said that Mr. Straker was not to be returned to court until his health status was clarified. Defendant was then transported back to the Royal Jail on Frederick Street and returned to the same cell lacking in a mattress or toilet.

For two weeks following defendant's return to the Royal Jail, he was taken to Port of Spain General Hospital and Mount Hope Hospital for evaluations and ultimately he was given a clean bill of health. Defendant was then transferred into general population at the Royal Jail. General population included very crowded cells, no mattresses, no toilet facilities, darkness, heat and small amounts of food and water. Defendant remained at the Frederick Street Royal Jail through April 2007.

In April, 2007 defendant was transferred to the Arouca Golden Grove Prison and remained there for three months until two days prior to his extradition to the United States. For the two day period prior to his extradition, defendant was held at the Maximum State Penitentiary where he had a health evaluation.

Anderson Straker was extradited to the United States on July 29, 2007. He refused to be photographed by the F.B.I. during the course of his extradition and all of his personal effects, such as a Bible and photographs of his children, were taken from his possession. Mr. Straker was not given the opportunity to contact family members or counsel prior to this extradition.

### III. DEFENDANT WAS IN CUSTODY AT THE TIME THAT HE PROVIDED ALL THREE OF HIS STATEMENTS

The test for determining whether a person is in custody is whether there is a "formal arrest or restraint on freedom of movement of the degree associated with a

7

formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam).Defendant acknowledges that he carries the burden of establishing custody.. That burden is readily met herein.

Defendant's statements to the Trinidadian authorities occurred on January 6 and January 7, 2006. At the time of the taking of the statements, defendant was officially under arrest, was detained in the La Horquetta Police Station in Trinidad, was questioned by two Trinidadian police officials, was not permitted to leave the police station, was told he was a suspect in the murder of Balram Maharaj, and had absolutely no freedom of movement. Defendant remained in the custody of the Trinidadian authorities until he was transferred to the custody of the F.B.I. on July 29, 2007. The F.B.I. 302 memorializing the transfer states that defendant was arrested at the Piarco International Airport on July 29, 2007. It was after that arrest that defendant purportedly made a statement to the F.B.I. that is a subject of this motion.

Under any objective consideration of the circumstances present when defendant made his three statements, he was in custody.

**IV. A JOINT VENTURE EXISTED BETWEEN TRINIDAD AND THE UNITED STATES IN THE INVESTIGATION OF THE MURDER OF BALRAM MAHARAJ.**

A Defendant may move to suppress statements made to foreign governments when the conduct of law enforcement officials renders them agents, or virtual agents of the United States. *United States v. Bin Laden*, 132 F. Supp. 2d 168, 187 (S.D.N.Y. 2001).The Supreme Court long ago noted that when issues are presented concerning the actions taken by agents of another sovereign, "the court must be vigilant to scrutinize the

8

attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods." *Byars v. United States*, 273 U.S. 28, 32 (1927).

     Defendant is continuing his factual investigation of this matter and expects to introduce additional factual evidence in support of his argument at the time that a hearing is held on this motion. However, certain factors of the investigation that led to the indictment clearly suggest that the United States and Trinidadian authorities were working in tandem in the investigation of the murder of Balram Maharaj. The F.B.I. was present for the recovery of the decedent's body parts; the F.B.I. was present for the autopsy of the decedent; on April 27, 2005, the United States issued a press release setting forth a reward for information about the kidnapping and suspects; the reward was posted in the April 22, 2008 edition of the Trinidad Guardian; David Suchit was brought to the U.S. Embassy to speak with F.B.I. Agent Claus in October, 2005 about the kidnapping of the decedent months before defendant was arrested for the crimes charged in the indictment; the F.B.I. made frequent trips to Trinidad to investigate the homicide; and there was high level of cooperation among law enforcement officers. These factors alone clearly suggest that the United States was actively involved in the investigation of the kidnapping and murder of Balram Maharaj and was deeply and substantially involved throughout defendant's detention.

     Defendant submits that the reward offered by the United States was designed to actively encourage citizens of T/T to involve themselves in the investigation of the murder of Mr. Maharaj and to encourage assistance with the United States.

     The joint-venture agency inquiry is a fact-driven one, requiring careful scrutiny of the circumstances presented in the individual case. See *United States v. Baker*, 888 F.

9

Supp 1521, 1533-34 (D. Ha. 1995) (citing *United States v. Toscanino*, 500 F. 2d 267 (2d Cir. 1974). Defendant submits that the burden regarding the issue of joint venture rests with the United States to prove that a joint venture did not exist. It is well established that the government bears the burden on proof of voluntariness. See *Lego v. Twomey* 404 U.S. 477, 489 (1972). Therefore, logic dictates that the burden should also be on the government in the joint venture-agency inquiry. These issues are logically subsumed within the burden of demonstrating that the statements the government seeks to introduce do not run afoul of the due process clause since an involuntary statement is barred even if obtained by the Trinidadians, assuming the joint relationship exists. Because the evidence related to the agency relationship issue is entirely within the government's control, at a minimum the burden of production must fall upon the government. See *Campbell v. United States,* 365 U.S. 86, 96 (1961) ("The ordinary rule, based upon considerations of fairness, does not place the burden upon a litigant of establishing facts particularly within the knowledge of the adversary", citing *United States v. DeCoster*, 624 F. 2d 196, 228 (D.C. Cir. 1979) (concurring opinion). [5]

**VI. DEFENDANT DID NOT RECEIVE ANY WARNINGS FROM THE TRINIDADIANS PRIOR TO HIS QUESTIONING ON JANUARY 6, 2006 AND JANUARY 7, 2006 THEREBY REQUIRING SUPPRESSION OF THOSE STATEMENTS THAT WERE OBTAINED AS PART OF A JOINT VENTURE BETWEEN THE UNITED STATES AND TRINIDAD/TOBAGO**

In both of defendant's statements to the T/T authorities, respectively occurring on January 6 and January 7, 2006, the opening paragraphs identify Anderson Straker as a suspect in the kidnapping and murder of Balram Maharaj and advise that the officers "cautioned him and told him of his rights and privileges and he made on (sic) reply on

---

[5] Defendant does acknowledge that in the absence of a finding of a joint venture, the Trinidadian officials conducting the interrogation did not have to administer Miranda warnings. See *United States v. Welch*, 455 F. 2d 211, 213 (2d, Cir. 1972)

request." There is nothing signed by defendant acknowledging that in fact he did receive appropriate warnings. Defendant submits that he was not advised of any rights that he may have had during either of the two interrogations. At the end of the first interrogation, he declined an invitation to read over the notes and sign them.[6]

The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution is violated by a failure to administer adequate warnings prior to the taking of a custodial statement as required *Miranda v. Arizona*, 384 U.S. 1 (1966). The warnings required by Miranda are designed to ensure that an individual subjected to custodial interrogation is made fully aware of his Fifth Amendment privilege. Id at 475.

The lack of Miranda warnings, assuming the existence of a joint venture, "will lead to suppression [of statements] if U.S. law enforcement themselves actively participated in the questioning… or if U.S. Personnel, despite asking no questions directly, used the foreign officials as their interrogational agents…." *United States v. Bin Laden* 132 F. Supp. 2d at 187.

## V. DEFENDANT'S PURPORTED STATEMENT TO THE F.B.I. MUST BE EXCLUDED FROM EVIDENCE BECAUSE IT IS THE PRODUCT OF COERCION IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

It is well recognized that the Due Process Clause of the United States Constitution is violated by the introduction of statements obtained by the use or threat of violence.

> Conviction following admission into evidence of confessions which are involuntary, i.e., a product of coercion, either physical or psychological, could not stand. This is not so because such confessions are unlikely to be true but because the methods used to extract them offend an underlying

---

[6] In Trinidad, there is a procedure known as a Statement Under Caution. This procedure mandates that an accused be advised of his right to a friend, relative and attorney-at-law, at the time of custodial questioning. This procedure is referenced in the State of Winston Phillip, The Republic of Trinidad & Tobago, The High Court of Justice, HCA #27 of 2004. Defendant proffers that he was never provided with the warnings required by the law of Trinidad & Tobago.

11

> principle in the enforcement of our criminal law: That ours is an accusatorial not an inquisitorial system—a system in which the state must establish guilt evidence independently and fairly secured and may not by coercion prove its charge against an accused out of his own mouth.

*Rogers v. Richmond*, 365 U.S. 534, 541 (1961).

The voluntariness inquiry focuses on whether the accused exercised his own free will in making the statement or instead gave way to that of his interrogators. See *Reck v. Pate,* 367 U.S. 433, 440 (1961) (suppression mandated where the facts indicate that the defendant's "will was overborne'); *Blackburn v. Alabama*, 361 U.S. 199, 280 (not the product of a rational intellect and "free will"); *Payne v. Arkansas*, 356 U.S. 560, 567 (1958) (statement coerced and did not constitute an "expression of free choice"); *Mincey* v. *Arizona,* 438 U.S. 385, 398 (statement not the product of a "rational intellect" and "free will"); *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968) (statement not the product of "free and rational choice").

Statements that are "extracted by… threats or violence" violate the Due Process Clause. *Hutto v. Ross*, 429 U.S. 28, 30 (1976). The use of physical violence to extract a statement is particularly offensive to "principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental*." Brown v. Mississippi*, 297 U.S. 278, 284 (1936), citation omitted. Because of the concern that statements truly be the product of a voluntary exercise of free will, actual violence need not be shown.[7] A statement given under a "credible threat" of violence is enough to render it involuntary and therefore inadmissible at trial. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (statement involuntary where incarcerated police informant promised the defendant

---

[7] Defendant will demonstrate that actual violence did occur as part of the process of violating his due process rights. There were other instances of non-violent coerciveness.

12

"protection" from his fellow inmates if the defendant told the informant the truth about the crime); *Payne v. Arkansas,* 356 U.S. 560 (1958) (statement involuntary where officials offered protection against mob violence).

A statement need not be obtained exclusively by violence or the fear of violence to be excluded on due process grounds. "The blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. at 206. Defendant submits that coercion is coercion regardless of whether the accused's will is subverted by physical, psychological or other improper methods.

Because of the recognition that unconstitutional coercion presents itself in many guises other than mere physical violence, courts have frequently looked to conditions of confinement in assessing the voluntariness of statements given during or immediately after such confinement. *Brooks v. Florida*, 389 U.S. 413, 414-415 (confession involuntary and in violation of Fifth Amendment where defendant housed in solitary for 14 days, "saw not one friendly face from outside the prison," and was "completely under the control and domination of his jailers.") Courts can also consider the diminutive, barren cell in which defendant was held and his restricted and unhealthy diet to which he was subjected during the period); *Stidham v. Swenson*, 506 F. 2d 478 (8th Cir. 1974) (in holding statement was involuntary, court relies heavily on fact that defendant had been held in solitary confinement in "subhuman co conditions" for 18 months prior to giving statement.

**a. General Conditions within the Trinidadian Prison System**

The 2002 United States Department of State Trinidad and Tobago Country Report found as follows:

13

Prison conditions at two of the three men's prisons generally met international standards. However, conditions were worse at the Frederick Street Prison in Port of Spain, which dates from the 1830s. It was designed for 250 inmates, but housed approximately 800 prisoners in December. Diseases such as chicken pox, tuberculosis, HIV/AIDS, and viruses spread easily, and prisoners had to purchase their own medication. The Commissioner of Prisons reported that the prison system held 4,900 inmates at year's end. Overcrowding was a problem at 4 of 8 facilities, where 2,290 inmates were housed in prisons built for 980.[8]

The 2006 United States Department of State Trinidad and Tobago Country Report

concluded:

Conditions in the prison system's eight facilities were somewhat upgraded But continued to be harsh. According to the prison service Commissioner, the number of prisoners at the Port of Spain prison, originally designed to accommo-Date 250 inmates, was reduced from 650 in 2005 to 554 at year's end. The number of prisoners in each 10 by 10 foot cell remained at five.[9]

Defendant spent approximately three months at the Arouca Golden Grove

Prison . The State Department reported this information about Golden Grove in its 2006

Trinidad and Tobago Country report.

In August and September, inmates in the remand section of the Golden Grove Prison rioted over poor prison conditions, including beatings by prison officers, bad food, denial of prison visits by relatives, and an order depriving inmates of their cell phones. During the riots, inmates injured prison guards, broke electrical Fixtures, and set fires to their cells. Faced with a situation of near-anarchy, the prisons service commissioner entered into direct negotiations with the inmates.

The Trinidad Guardian, one of the most widely read newspapers in T/T, ran an article by Leela Remdeen in its July 5, 2004 edition that addressed prison conditions within the nation. Ms. Ramdeen wrote of University of Denver Professor Thomas Russell's views of the prisons that he articulated during a colloquium organized by the Ministry of the AG and Ministry of National Security of T/T.

He had visited our prison in Port-of-Spain and found his visit to be profoundly disturbing." He described the prison as being "… not the

---

[8] Defendant was held at the Frederick Street Prison for a substantial period of his detention in Trinidad.
[9] Defendant shared a cell six other men. The conditions were deplorable and lacking in basic features such as a sink, toilet or appropriate bedding for seven men.

inner circle of hell, but one of the circles of hell." He paid tribute to prison officers who were striving to manage a system with few resources and deplorable conditions.

The information about the prisons in T/T, including the facilities that Anderson Straker was detained in, was available to the public and was in fact documented by the United States.

b**. Physical Violence against Anderson Straker**

Statements that are "extracted by…threats or violence" violate the Due Process Clause. *Hutto v. Ross*, 429 U.S. 28, 30 (1976). The use of physical violence to extract a statement is particularly offensive to "principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Brown v Mississippi*, 297 U.S. 278, 284 (1935) (citations omitted) A statement given under a "credible threat" of violence is enough to render it involuntary and therefore inadmissible at trial. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991).

The unconstitutional coercion of defendant occurred in both a physical and psychological form. The eighteen months of coercion and abuse that preceded his being taken into the formal custody of the United States on July 29, 2007 renders his purported statement an involuntary act. Accordingly, his statement should be excluded from evidence.

**VI. THE DEFENDANT'S STATEMENT TO THE F.B.I. WAS OBTAINED OVER TIME THROUGH BOTH ACTUAL VIOLENCE AND ABUSIVE CONDIONS OF CONFINEMENT AND MUST THEREFORE BE SUPPRESSED PURSUANT TO THE SELF-INCRIMINATION CLAUSE OF THE FIFTH AMENDMENT TO <u>UNITED STATES CONSTITUTION</u>.**

Defendant submits that his statement on July 29, 2007 to the F.B.I. was involuntary and must be suppressed even if this Court finds that the Trinidadian

15

authorities had no obligation to advise defendant of any rights he may have had or even if *Miranda* warnings provided by the F.B.I. were adequate. Warnings, or the lack of requirement for a foreign official to administer warnings, do not right the wrong of obtaining a statement through abuse and oppression. "(W)here the conduct of foreign officials in acquiring the evidence is so extreme that they shock the conscience a federal court in the exercise of its supervisory powers can require exclusion of evidence so seized." *United States v. Maturo*, 982 F.2d 57. 60-61 (2d. Cir. 1992).

> The Fifth Amendment to the United States Constitution states in relevant part:
>
> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law….

Defendant acknowledges that even in the absence of appropriate compliance with the mandate of Miranda, a violation of the Fifth Amendment privilege against self-incrimination does not occur until the government seeks to introduce the challenged statement in evidence in a criminal trial in the United States. "Although conduct by law enforcement officials prior to trial may ultimately impair that right [privilege against self-incrimination], a constitutional violation occurs only at trial." *United States v. Verdugo-Urguidez*, 494 U.S. 259, 264 (1990). Thus, if the government chooses not to use statements obtained in violation of the Self-Incrimination Clause, there is no violation of the Fifth Amendment's Self-Incrimination Clause---no harm, no foul in the self-incrimination context only.

16

If the United States, however, does seek admission of defendant's statement to the F.B.I., it can be excluded on grounds of a violation of the Fifth Amendment Privilege against self- incrimination regardless of Mr. Straker's citizenship or whether the violation began in Trinidad/Tobago.

> (U.S. Const.amend.V.) The crucial phrase is "no person" and it neither denotes nor connotes any limitation in scope, in marked contrast to the use of "the people" in most of the other Amendments contained with the Bill of Rights. From the outset then, these protections seemingly apply with equal vigor to all defendants facing criminal prosecution at the hands of the United States, and without apparent regard to citizenship or community connection.

*United States v. Bin Laden*, 132 F. Supp.2d at 183 (internal citations omitted).[10]

The statement provided to the F.B.I. on July 29, 2007 followed 18 months of confinement, at least one significant assault by an agent of the F.B.I., and on-going conditions of deplorable confinement. The July 29, 2007 statement, in the context of how it was obtained, was clearly involuntary and certainly not an utterance that the defendant chose to make. Accordingly, the United States should be prevented from introducing the statement in evidence at trial. "(I)f the statement is not voluntarily given, whether to a United States or foreign officer, the defendant has been compelled to be a witness against himself when the statement is admitted*." Brulay v, United States,* 383 F.2d 345, 349 n. 5 (9th Cir.)

## CONCLUSION

For the reasons set forth herein, and for those reasons that may be addressed at a hearing on this Motion, defendant prays this Honorable Court suppress as evidence against him all three of the statements addressed herein.

---

[10] The court added," (W) e believe that the policies undergirding the Fifth Amendment privilege against self-incrimination are no less relevant when the criminal defendant at issue is an unconnected, non-resident alien." Id at 185

Respectfully submitted


_____/s/_____
Steven R. Kiersh #323329
5335 Wisconsin Avenue, N.W., Suite 440
Washington, D.C. 20015
(202) 347-0200


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing Motion to Suppress Statement was served upon Bruce Hegyi, Esquire and Jeanne Hauch, Esquire, Assistant U.S. Attorneys via PACER and regular mail, 555 4th Street, N.W., Washington, D.C. 20530 and upon all other counsel if record via PACER on this the 6th day of April, 2007.


_____/s/_____
Steven R. Kiersh