IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| | § | |
| - vs - | § | CRIMINAL No.   06-102-02 (JDB) |
| | § | |
| | § | |
| **ANDERSON STRAKER,** *el al.* | § | |
| | § | |
| Defendants. | § | |
| | § | |

**GOVERNMENT'S OPPOSITION TO MOTIONS TO SUPPRESS STATEMENTS
OF DEFENDANT ANDERSON STRAKER AND
DEFENDANT CHRISTOPHER SEALEY**

As set forth below, the United States of America ("United States" or "Government")

opposes defendant Anderson Straker's Motion to Suppress Statements [Document #188] and

defendant Christopher Sealey's Motion to Suppress Statements [Document #223], and responds

to defendant Wayne Pierre's Motion to Suppress Statement [Document #193].

*Nature of the Case*

Defendants Anderson Straker ("Mr. Straker"), Christopher Sealey ("Mr. Sealey"), and

Wayne Pierre ("Mr. Pierre") are three of twelve Trinidadian nationals who have been indicted in

the District of Columbia for Conspiracy to Commit Hostage Taking Resulting in Death and with

Hostage Taking Resulting in Death, both charges being in violation of 18 U.S.C. § 1203(a).

According to the allegations of the superseding Indictment, beginning on or about February 1,

2005 and ending on or about April 15, 2005, Mr. Straker and his co-conspirators, embarked upon

a common plan to obtain the money of an American citizen, Balram Maharaj, who was a visitor

to the Island of Trinidad and who had relatives there.  The conspirators' initial plan was to

kidnap Mr. Maharaj's 5-year old son, Dinesh Maharaj, and to hold Dinesh for ransom. However, the conspirators later discarded the initial plan and determined to kidnap Balram Maharaj and sought to obtain a ransom of Mr. Maharaj's money, from Mr. Maharaj's relatives, for his release. On April 6, 2005, in accordance with their plan, Balram Maharaj was abducted. and a ransom of $3,000,000 Trinidad (approximately $500,000 US) was demanded for his release. Mr. Maharaj was held captive at a hideout in a mountainous jungle region of Trinidad. On or about April 13, 2005, Mr. Maharaj expired at the remote hideout, as he languished in the hands of the conspirators. Following Mr. Maharaj's death, members of the conspiracy dismembered his body and buried his body parts at another remote location in the mountainous jungle.

By April 15, 2005, the ransom demands had ceased.

In January of 2006, Mr. Maharaj's dismembered and decomposed body was located in a mountainous jungle region in Trinidad.

### The Statements Potentially In Issue

With regard to Mr. Straker, Mr. Sealey, Mr. Pierre, and defendant Kevin Nixon ("Mr. Nixon") the following statements, arguably the result of custodial interrogation, are potentially in issue:

1.    Anderson Straker. On January 6-7, 2006, Mr. Straker provided statements to the Trinidadian authorities in Trinidad and Tobago. Thereafter, on July 29, 2007 Mr. Straker provided a statement to the FBI en route from Trinidad and Tobago to Washington, D.C., following a waiver of his *Miranda* rights.

2.    Christopher Sealey. Mr. Sealey provided on August 8, 2006 a statement to the Trinidadian authorities, following his advice of rights ("Judge's Rules") under

Trinidadian law, in the presence of his father and a Trinidadian Justice of the

Peace (and sworn to before the Justice of the Peace.)  In addition, on August 8,

2006, Mr. Sealey provided the FBI with a statement in Trinidad & Tobago,

following his advice and waiver of his (International) *Miranda* warnings.

3.    Wayne Pierre.  Mr. Pierre provided on January 28, 2006 a statement to the

Trinidadian authorities.

4.    Kevin Nixon.  Mr. Nixon provided on January 28, 2006 a statement to the

Trinidadian authorities.   Mr. Nixon has not moved to suppress that statement.

### Confirmation of Government's Representations in Its Response in Compliance With the Court's Order Dated July 17, 2008

Because the only statements that are arguably the result of custodial interrogation the

Government intends to introduce at trial are (1) Mr. Straker's July 29, 2007 statement to the FBI,[1]

(2) Mr. Sealey's August 8, 2006 statement to the Trinidadian authorities,[2] and (3) Mr. Sealey's

August 8, 2006 statement to the FBI,[3] *see* Government's Response in Compliance With the

Court's Order Dated July 17, 2008 [Document #232], page 5, it is only those statements that

remain in issue for the purposes of these proceedings.  *See* 7/28/08 Memorandum Opinion

---

[1]  A true and correct copy of the FBI 302 memorializing Mr. Straker's statement to the FBI is attached hereto as Exhibit A.  A true and correct copy of Mr. Straker's executed (international) *Miranda* advice and waiver form is attached hereto as Exhibit B.

[2]  A true and correct copy of Mr. Sealey's statement to the Trinidadian authorities (and certification by the Justice of the Peace) is attached hereto as Exhibit C.

[3]  A true and correct copy of the FBI 302 memorializing Mr. Sealey's statement to the FBI is attached hereto as Exhibit D.  A true and correct copy of Mr. Sealey's executed Miranda advice and waiver form is attached hereto as Exhibit E.

[Document #235], page 13.[4]

### Mr. Sealey's Allegations Concerning His August 8, 2006 Statement to the Trinidadian Authorities and His August 8, 2006 Statement to the FBI

In his Motion [Document #223], Mr. Sealey was arrested by the Trinidadian authorities on August 1, 2006 [Straker's Memorandum, page 3], and that subsequent to his arrest, he was questioned by the Trinidadians on August 7 and again on August 8, 2006. [Id.]  On August 7, 2006, Mr. Sealey says he was questioned and returned to his cell and "denied visits from his family." [Id.]  On August 8, 2006, Mr. Sealey claims, he was taken from his cell in the early evening to be interviewed, at which point he says he asked to speak to a lawyer or that his family be told to get a lawyer, however, "instead, police summoned his father, a known drug abuser." [Id.] At some point, Mr. Sealey now claims, "the FBI joined the interrogation." [Id.] Mr. Sealey's Motion continues:

> It [the interrogation] went late into the night.  Neither Mr. Sealey nor his father could read or write.  At not time did he agree to waive his right to counsel, in fact, he asked for counsel.  Ultimately, late in the evening, he was advised that if he and his father signed his father could leave and he would be released the next day. He signed and was charged and has been incarcerated since that time.

[Id., pages 3-4] Mr. Sealey complains that, because the FBI "was present" during much of the second interrogation, Mr. Sealey asserts he "should be afforded rights under *Miranda*." [Id., page 4] As a result, Mr. Sealey claims "any statements he allegedly made were not voluntary; rather, [they were] coerced by design and not really his statement." [Id., page 5]

---

[4] Hence, in the Government's view, Mr. Pierre's Motion to Suppress Statement [Document #193], and that portion of Mr. Straker's Motion to Suppress Statements [Document #188] that relates to Mr. Straker's statements to the Trinidadian authorities, are moot.

<u>Mr. Sealey's Motion Has Taken Liberties With the Facts</u>

Contrary to Mr. Sealey's version of events, there was no joint venture between the FBI and the Trinidadians during the time of his statements to each of them. On information and belief, Mr. Sealey was first arrested by the Trinidadians, on a Trinidadian arrest warrant, on August 8, 2006, not August 1st as his Motion claims. The FBI was not involved in the arrest of Mr. Sealey. Following Mr. Sealey's arrest, Mr. Sealey was provided by the Trinidadian authorities with – and waived – his rights under Trinidadian law (known as "Judge's Rules").[5] Indeed, his statement to the Trinidadians, ***made in the presence of a Justice of the Peace***, confirms: "I have been told that I need not say anything unless I wish to do so and that whatever I say may be given in evidence. I have also been told that I have the right to retain a legal advisor." [Sealey's TT Statement (Exhibit C) page 1][6] A review of the nine-page handwritten statement demonstrates that Mr. Sealey signed each page and initialed each change in and to that document. The document is signed on each page by the Trinidadian Justice of the Peace together

_____

[5] In Trinidad & Tobago, a defendant is not entitled to a court-appointed attorney during questioning. Under the Judge's Rules, a suspect is advised, among other things, that he or she is not required to say anything and that anything said can be used in evidence against the suspect. The suspect is advised that he or she may have an attorney, relative, or friend present during questioning. Mr. Sealey acknowledged and waived his rights under the Judge's Rules. In Mr. Sealey's case, at Mr. Sealey's election, Mr. Sealey father was present during the questioning of him by the Trinidadian authorities.

[6] A copy of Mr. Sealey's statement to the Trinidadian authorities is attached hereto as Exhibit A. Mr. Sealey used an alias, "Christopher Bourne" at the time of his arrest and questioning.

with the Trinidadian Constables. The Justice's certification notes, among other things, that upon

the Justice's arrival, the Justice required the Police to leave the interview room:

> [S]o I could speak to the suspect to which they [the Police] complied. I then
> asked the suspect if he was threatened[,] abused[,] or promised anything to give
> the statement and he said No. He was giving the statement on his own free will. I
> also told him he was not obliged to give any statement and he said he wanted to
> give a statement and he wanted the police to write down the statement. I then
> recalled the police officers to the room. WPC Gosyne got the statement [illegible]
> wrote all that was required at the top and read the preamble to the suspect and he
> said [he] understood and she wrote it. The suspect signed and dated it along with
> his father. PC Pinder and myself also signed and dated it. The suspect dictated
> his statement while WPC Gosyne recorded it. She also asked questions so as to
> clarify areas which needed to be properly identified of to which the suspect
> answered. She ten asked him if he was satisfied with [what] she wrote as she read
> the statement to the suspect in the presence of his father. He said he was satisfied
> that it [was] correctly recorded and he signed and dated, [illegible] PC Pinder, the
> suspect, and myself signed and dated it. The suspect then wrote a Certificate
> [illegible] given the Judges Rules to which [illegible] he signed and dated it and
> his father did likewise. PC Pinder and I did likewise.

[Trinidadian Statement, pages 7-9]   Thus, far from being abused and overborne, Mr. Sealey was

treated with respect and dignity by the Trinidadian authorities and his rights were scrupulously

observed in his confession to them.

Similarly, Mr. Sealey's rights were carefully safeguarded in his August 8, 2006

confession to the FBI. It is arguably true that FBI Assistant Legal Attache ("ALAT") Marvin

Freeman was "present" during Mr. Sealey's interview with the Trinidadian authorities. In fact,

ALAT Freeman was seated in a cubical near (and in the same open room) where Mr. Sealey was

speaking to the Trinidadian authorities in a different cubical. As such, ALAT Freeman could

hear what was being said to Mr. Sealey and what Mr. Sealey was saying to the Trinidadian

authorities. during his confession to the Trinidadians. However, ALAT Freeman did not ask any

questions of Mr. Sealey during his interview with the Trinidadians, nor did he request of the

Trinidadians that they ask any questions of Mr. Sealey.

After the Trinidadians had completed their interview with Mr. Sealey, and had left the room, ALAT Freeman advised Mr. Sealey – in the continued presence of Mr. Sealey's father -- of his *Miranda* rights under American law, using an international Notification of Rights form (Exhibit E). Prior to being questioned by ALAT Freeman, Mr. Sealey acknowledged his *Miranda* rights, voluntarily waived them, and signed and initialed the Form. Having waived his Rights, Mr. Sealey proceeded, in the presence of his father, to provide a statement to ALAT Freeman in which he confessed his involvement in the conspiracy to kidnap Balram Maharaj for ransom. Mr. Sealey's confession was memorialized in an FBI 302 (Exhibit D.)

### Mr. Sealey's Allegations Concerning His July 29,2007 Statement to the FBI

In his Motion [Document #188], Mr. Straker makes various factual assertions related to his arrest on January 6, 2006 in Trinidad & Tobago by members of the Trinidad & Tobago police force on Trinidadian charges in relation to the kidnapping and murder of Balram Maharaj. [*See* Straker's Motion, pages 3-7] These factual assertions are generally related to Mr. Straker's alleged questioning and treatment by the Trinidadian authorities and the conditions and circumstances of his detention and court appearances from January 6, 2006 through January 12, 2006. [*See generally* id.] The Government generally denies that Mr. Straker was mistreated and/or assaulted by the Trinidadian authorities and/or members of the FBI. Nevertheless, the Government declines to be drawn at length into Mr. Straker's wild and fanciful allegations as to the events (or non-events) of January 6, 2006 through January 12, 2006, because they do not – and cannot – legitimately impact on the only custodial statement by Mr. Straker that the Government will seek to introduce. The statement the Government will seek to introduce at trial

-7-

is the statement Mr. Straker provided to the FBI on July 29, 2007 (Exhibit A), following Mr.

Straker's knowing and voluntary waiver of his *Miranda* rights (Exhibit B). This statement

occurred during the course of Mr. Straker's extradition from Trinidad to the United States. As a

result, it is only Mr. Straker's allegations related to his July 29, 2007 statement that this

Opposition will specifically address.

With regard to Mr. Straker's claims associated with his July 29, 2007 confession to the

FBI, Mr. Straker's Motion says:

> In April, 2007 defendant was transferred to the Arouca Golden Grove
> Prison and remained there for three months until two days prior to his extradition
> to the United States. For the two day period prior to his extradition, defendant
> was held at Maximum State Penitentiary where he had a health evaluation.

> Anderson Straker was extradited to the United States on July 29, 2007. He
> refused to be photographed by the F.B.I. during the course of his extradition and
> all of his personal effects, such as a Bible and photographs of his children, were
> taken from his possession. Mr. Straker was not given the opportunity to contact
> family members or counsel prior to this extradition.

[Straker's Motion, page 7] Mr. Straker continues: "The F.B.I. 302 is the only memorialization

of the statement purportedly offered by defendant. Defendant has not signed the statement that

he is alleged to have made to the F.B.I., the statement is not in defendant's handwriting, and there

are no audio or visual recordings of defendant offering a statement." [Id., page 2] As the basis

for the requested suppression of his confession to the FBI, Mr. Straker says, without factual

elaboration: "[T]he statement made to the F.B.I. was involuntary and obtained in violated [sic]

of defendant's Fifth Amendment privilege against self-incrimination" [id.],[7] and "[t]he eighteen

_____

[7] To be sure, Mr. Straker's Motion earlier complained (falsely) that Mr. Straker was
slapped in the mouth by an FBI Agent on January 8, 2006. However, Mr. Straker's Motion
makes not attempt to explain how his (false) allegation of being slapped on January 8, 2006
could have any legitimate impact on his decision voluntarily to waive his *Miranda* rights <u>some</u>

months of coercion and abuse [in the Trinidad prisons] that preceded his being taken into the

formal custody of the United States on July 29, 2007 renders his purported statement an

involuntary act." [Id., page 15]

Mr. Straker's Motion Misstates the Truth

Mr. Straker was never assaulted, threatened, or mistreated by the FBI (nor the Trinidadian

authorities), in January of 2006 or otherwise.  Moreover, when Mr. Straker was being extradited

to the United States to face the charges he knew awaited him, he voluntarily waived his *Miranda*

rights and spoke voluntarily with the FBI Agents.  In so doing, Mr. Straker set forth his

involvement in the scheme to take hostage Balram Maharaj for ransom together with the roles of

various conspirators.  He spoke at length.  He did so knowingly and voluntarily and free from

unlawful coercion.

### THE ALLEGATIONS OF DEFENDANT'S MOTIONS ARE WITHOUT MERIT AND SHOULD BE DENIED

*Extraterritorial Applicability of the Fifth Amendment to Foreign Interrogations*

In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court

distinguished the Fourth Amendment right against unreasonable searches and seizures from the

Fifth Amendment right against self-incrimination on the ground that the latter is a *trial right*.[8]

That distinction was reaffirmed recently by the Supreme Court in *Chavez v. Martinez*, 538 U.S.

760 (2002) (plurality opinion), which held that it is not the failure to give *Miranda* warnings that

---

18-1/2 months later nor how it could or should render his subsequent confession invalid.

[8] As the Court made clear in *Miranda*, a suspect must "be warned that he has a right to remain silent, that any statements he does make may be used as evidence against him, and that he has a right to the presence of an attorney" during custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

violates a suspect's Fifth Amendment rights, but rather the use at trial of any "unwarned" statements which violates that suspect's rights. *Accord United States v. Patane*, 542 U.S. 630, 631 (2004) ("[P]olice do not violate a suspect's rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial."). This "trial right" distinction, as interpreted by the Supreme Court, also mandates that the protections of the Fifth Amendment, unlike those of the Fourth Amendment, be extended to nonresident aliens tried in the United States. *Verdugo*, 494 U.S. at 264 ("[t]he privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental *trial right of criminal defendants*") (*citing Malloy v. Hogan*, 378 U.S. 1 (1964) (emphasis added)). The *Verdugo* Court noted that "[the Fourth Amendment], by contrast with the Fifth and Sixth Amendments, extends its reach only to 'the people.'" and thus "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." Id. at 265.[9] The Court stated that the Fifth Amendment's use of the word "person," in contrast to the narrow usage of "the people" in the Fourth Amendment, reveals that unlike the Fourth Amendment, which is restricted to United States nationals, the Fifth Amendment will protect any person the United States has committed to prosecuting, regardless of his or her nationality. Id. at 264; *see also United States v. Gouveia*,

---

[9] Key portions of the *Verdugo* court's analysis focused on the wording of the Fourth, Fifth and Sixth Amendments, particularly the use of the word "people"in the Fourth Amendment as distinct from the use of the word "person" in the Fifth and Sixth Amendments. 494 U.S. at 265. The Court drew a distinction between the right to be free of intrusive searches and seizures, actions "fully accomplished" prior to trial, and the privilege against self-incrimination, a violation of which can occur "only at trial." Id. at 264.

467 U.S. 180, 187-89 (1984) (holding that constitutional protections incident to a fair trial attach when the government commits to prosecute).

The holding and rationale of *Verdugo* were followed in *United States v. Bin Laden*, 132 F.Supp.2d 168 (S.D.N.Y. 2001), where the District Court reaffirmed that Fifth Amendment protections "seemingly apply with equal vigor to all defendants facing criminal prosecution at the hands of the United States, and without apparent regard to citizenship or community connection." 132 F. Supp.2d at183; *cf. Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (holding that United States citizens stationed abroad could invoke the protection of the Fifth and Sixth Amendments).

### *Miranda and Overseas Interrogations*

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), custodial interrogation automatically triggers numerous procedural safeguards to protect an individual's Fifth Amendment right against compulsory self-incrimination.  As explained in *Miranda*, custodial interrogation refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.  The Court has stressed that these safeguards come into play *only* when the defendant is subject to *both* custody and interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980); *Beckwith v. United States*, 425 U.S. 341, 347 (1975).

With regard to the scope of the extra-territorial application of *Miranda*,[10] the *Bin Laden* Court suggested that FBI agents should make inquiry into a specific Nation's law regarding what *Miranda*-type rights are available to the suspect, and speak to local authorities to determine whether they will allow the suspect to consult with an attorney. 132 F. Supp.2d at 192 n.23. However, the Court observed, even *Miranda* "does not require law enforcement agents to promise that which they cannot guarantee or that which is in fact impossible to fulfill." Id. at 188. "The goal is to convey to a suspect [overseas] that, with respect to any questioning by United States agents, his ability to exercise his right to the presence and assistance of counsel ... hinges on two external considerations arising from the fact of his foreign custody." Id. These two factors are: (1) "the availability of public counsel overseas turns chiefly on foreign law;" and (2) "foreign law may also ban all manner of defense counsel from even entering the foreign stationhouse, and such law necessarily trumps American procedure." Id.

Before a statement resulting from a custodial interrogation will be admitted in evidence in a prosecution in the United States, the Government must also show that a statement was made voluntarily. *Malloy v. Hogan*, 378 U.S. 1 (1964). However, it is unclear whether the

---

[10] It is well-established that the Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Texas v. Cobb*, 532 U.S. 162, 166 (2001) *(quoting McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991))*. Accordingly, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Michigan v. Jackson*, 475 U.S. 625, 636 (1986). However, it is generally held that there is no constitutional infirmity for a <u>federal</u> law enforcement agent to interview a defendant against whom <u>state</u> charges are pending. *See, e.g., United States v. Avants*, 278 F.3d 510, 515-18 (5th Cir. 2002). By analogy, this same principle should apply in the international context. *Cf., United States v. Rashed*, 234 F.3d 1280, 1281 (D.C. Cir. 2000); *United States v. Liddy*, 542 F.2d 76, 79 (D.C. Cir. 1976).

-12-

Constitution requires suppression of involuntary statements that are the product of coercion solely at the hands of foreign authorities. In *Bram v. United States*, 168 U.S. 532, 565 (1897), the Supreme Court held that a statement coerced by foreign authorities "was wrongfully admitted" under the Fifth Amendment. However, *Bram* did not specifically consider whether coercion by a foreign actor would affect constitutional analysis. To be sure, in practice, some courts effectively admit only voluntary statements, *see United States v. Yousef*, 327 F.3d 56, 146 (2nd Cir.), *cert. denied*, 540 U.S. 933 (2003); *United States v. Welch*, 455 F.3d 211, 213 (2d Cir. 1972) ("Whenever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the statement was voluntary"), some Courts have questioned whether statements coerced by foreign authorities might nonetheless be admissible, *see United States v. Wolf*, 813 F.2d 970, 973 n.3 (9th Cir. 1987) (suggesting that, under *Colorado v. Connely*, 479 U.S. 157 (1986), suppression is not required when statement is obtained by coercion of foreign police, but not deciding the issue), while other Courts suggest that involuntary statements are inadmissible only if the conduct "shocks the conscience." *United States v. Yousef*, 327 F.3d at 146; *cf. United States v. Mitro*, 880 F.2d 1480, 1483 (1st Cir. 1989) (stating, in the context of foreign wiretap evidence, "only conduct on the part of foreign police that shocks the judicial conscience could warrant suppression of foreign-seized evidence").

### *The Scope of the Joint Venture Doctrine*

The precise contours of the "joint venture" doctrine have not been clearly defined. *See United States v. Yousef*, 327 F.3d 56, 146 (2d Cir. 2005). Indeed, the courts have not devised a uniform test for determining the point at which the involvement of United States officials in an overseas interrogation turns into a joint venture. A review of the case law indicates that it is a fact-specific inquiry, with no one factor being determinative. *See, e.g., United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) (finding no joint venture between United States and Saudi officials despite the fact that Americans submitted questions to Saudi interrogators, some of which were put to defendant, because Saudis never acted as a "mouthpiece or mere conduit for their American counterparts," and the US law enforcement officials were not trying to "evade the strictures of *Miranda*"); *United States v. Emery*, 591 F.2d 1266, 1267 (9th Cir. 1978) (holding joint venture doctrine applied where DEA agent coordinated foreign arrest and was present during questioning by foreign police); *United States v. Morrow*, 537 F.2d 120, 140-41 (5th Cir. 1976) (finding no joint venture where United States officers merely furnish information to foreign officials); *United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970) (*Miranda* rule has no application where arrest and interrogation focused upon violations of Canadian law despite presence of United States law enforcement officer); *Stonehill v. United States*, 405 F.2d 738, 746 (9th Cir. 1968), *cert. denied*, 395 U.S. 960 (1969) (finding no joint venture when United States officials offered information to Philippine officials and had knowledge of raid conducted by Philippine officials); *and cf., United States v. Peterson*, 812 F.2d 486, 488-89 (9th Cir. 1987) (Kennedy, J.) (concluding that a Philippines wiretapping operation with "substantial" United States involvement was a joint venture, but finding no Fourth Amendment violation

-14-

because the search met the Fourth Amendment's reasonableness requirement); *United States v. Marzano*, 537 F.2d 257, 269-70 (7th Cir. 1976) (finding no joint venture where United States law enforcement officers were merely present at the scene of a search and seizure); *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir. 1965) (holding although United States officers were "present and cooperating in some degree" with local officials, there was no joint venture sufficient to invoke the protections of the Fourth Amendment).

The Court's rationale in *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), is persuasive. In *Abu Ali*, United States citizen Ahmed Omar Abu Ali was arrested on June 8, 2003, in Saudi Arabia, by the Saudi Arabian authorities, following their investigation into the May 12, 2003 suicide bombings in Riyadh, Saudi Arabia, in which approximately 34 people, including nine Americans, were killed. *Id*. at 223-24. Following his arrest, the Saudi authorities interrogated Abu Ali. During his interrogation by the Saudis, FBI and Secret Service Agents observed (through a one-way mirror from another room) the interrogation by the Saudi's of Abu Ali and submitted questions for the Saudi's to ask of Abu Ali, some of which questions were posed to Abu Ali by the Saudis and some of which were not. *Id*. at 225. During his interrogation by the Saudis, Abu Ali was never provided with Miranda-type warnings. *Id*. at 226. Following an evidentiary hearing, the District Court determined that no "joint venture" existed between the Saudi and American personnel and it refused to suppress Abu Ali's statements to the Saudis. *Id*. at 227.

Prior to affirming Abu Ali's convictions, the Fourth Circuit canvassed the available case authority on the issue of "joint venture," *see generally id*. at 228-30, and observed, "these cases do permit us to derive one general rule:  mere presence [of US Government agents] at an

-15-

interrogation does not constitute the 'active' or 'substantial' participation necessary for a 'joint venture.'" *Id.* at 229. In its opinion, the Fourth Circuit noted that the United States played no role in the actual arrest of Abu Ali and that Saudi government controlled the questioning of Abu Ali. "In sum, the Saudis were always in control of the investigation. It is clear to us, as it was to the district court, that the [Saudi] Mabahith never acted as a mouthpiece or mere conduit for their American counterparts. Based on these findings, we are convinced, as was the district court, that American law enforcement officials were not trying to 'evade the strictures of *Miranda*,' and the June 15 interrogation did not rise to the level of a joint venture." *Id.* at 230 (citations omitted).

The Fourth Circuit was generally untroubled by the fact that the FBI had submitted questions to the Saudi's for use in their interrogation of Abu Ali. Indeed, the Fourth Circuit cautioned that a contrary finding would be "problematic" for at least two reasons : (1) *Miranda* was only intended to regulate the conduct of American law enforcement officers and, absent significant involvement by American law enforcement personnel, was not intended to apply extraterritorially to foreign officials; and (2) a well-grounded fear that a contrary holding could discourage the United States and its allies from cooperating in international criminal investigations. *Id.* at 230. The Fourth Circuit warned: "To impose all of the particulars of American criminal process upon foreign law enforcement agents goes too far in the direction of dictation, with all its attendant resentments and hostilities. Such an unwarranted hindrance to international cooperation would be especially troublesome in the global fight against terrorism, of which the present case is clearly a part." *Id.*

## THERE WAS NO "JOINT VENTURE" AND THE STATEMENTS
## SHOULD BE ADMITTED

Simply put, there was no joint venture in this investigation between the Republic of

Trinidad & Tobago and the United States of America. Each Country engaged in *its own*

investigation into the violations of *its* respective laws. To be sure, there was a level of

cooperation between the two sovereigns. As set forth in *Abu Ali*, such cooperation should be

both expected and encouraged. 528 F.3d at 230. Clearly, the Trinidadians never "acted as a

mouthpiece or mere conduit for their American counterparts.... [and the] American law

enforcement officials were not trying to 'evade the strictures of *Miranda*'...." *Id*.

As a result, there is no legitimate basis on which to find that a "joint venture" existed.[11]

### Christopher Sealey

With regard to Mr. Sealey's August 8, 2006 arrest and interview by the Trinidadian

authorities: (1) Mr. Sealey was arrested on an outstanding Trinidadian warrant; (2) no American

agent was present at the time of Mr. Sealey's arrest; (3) American officials did not submit

questions to the Trinidadians to ask Mr. Sealey in their interrogation of him; (4) Mr. Sealey *was*

provided with the Trinidadian version of *Miranda* warnings (which he waived); (5) Mr. Sealey

elected (as was his right under Trinidadian law) to have his father present during his

interrogation; and (6) a neutral Trinidadian Judicial Officer was present during the Trinidadian

interrogation of him. Thus, Mr. Sealey's August 8, 2006 statement to the Trinidadian authorities

---

[11]  Moreover, even it a joint venture had existed, which it did not, the each of the statements at issue should be admitted under *any* standard. As established above, each of the statements was voluntarily given by the defendant and there was no conduct on the part of any law enforcement person that could fairly begin to "shock the conscience" of the Court. To the contrary, both the Trinidadians and the FBI conducted themselves in an exemplary manner.

was not the result of a "joint venture" between the Trinidadians and the American authorities, and Mr. Sealey was provided by the Trinidadians with safeguards similar to – and, as carried out, perhaps even superior to – the safeguards sought to be vindicated by *Miranda*.

Turning to Mr. Sealey's August 8, 2006 confession to the FBI, Mr. Sealey was advised of his (international) *Miranda* rights, in the presence of his father, and he knowingly and voluntarily waived them. Thereafter, in the continued presence of his father, Mr. Sealey proceeded to confess his involvement in the conspiracy and hostage-taking for ransom of Balram Maharaj.

Because both Mr. Sealey's statement to the Trinidadian authorities and his statement to the FBI were knowingly and voluntarily provided by him, free from unlawful coercion, after waiving his rights under both Trinidadian and United States laws, Mr. Sealey's Motion to Suppress his statements is without merit and should be denied.

<u>Anderson Straker</u>

Similarly, there was no "joint venture" between the Trinidadians and the FBI in relation to Anderson Straker's July 29, 2007 confession to the FBI (nor otherwise.) As Mr. Straker's Motion admits, prior to Mr. Straker's questioning by the FBI on July 29, 2007, Mr. Straker was then in the custody of the FBI and he was being extradited to the United States by them. As confirmed by the FBI 302, the only persons present during the interview with Mr. Straker were FBI personnel. Prior to being questioned, Mr. Straker knowingly and voluntarily waived his *Miranda* rights free from unlawful coercion. Thereafter, Mr. Straker explained to the FBI his involvement in the conspiracy to take hostage for ransom Balram Maharaj and Mr. Straker outlined the roles of others in the scheme, even providing information as to various conspirators' efforts to obstruct justice after the death of the victim.

Because Mr. Straker's statement to the FBI was knowingly and voluntarily provided by him, free from unlawful coercion, after waiving his *Miranda* rights, Mr. Straker's Motion to Suppress his statement is without merit and should be denied.

WHEREFORE, for each of the independent reasons set forth above, Defendant Anderson Straker's Motion to Suppress Statements [Document #188] and defendant Christopher Sealey's Motion to Suppress Statements [Document #223] should be, as set forth above, be denied.

Respectfully submitted,

JEFFREY A. TAYLOR (D.C. Bar No. 498610)
United States Attorney


/S/

By:    _____

BRUCE R. HEGYI (D.C. Bar No. 422741)
Assistant United States Attorney
Federal Major Crimes Section
555 Fourth Street, N.W., Room 4848
Washington, D.C.  20530
(202) 305-9637
(202) 353-9414 (fax)
www.bruce.hegyi@usdoj.gov


JEANNE M. HAUCH (D.C. Bar No. 426585)
Assistant United States Attorney
National Security Section
555 Fourth Street, N.W., 11th Floor
Washington, D.C.  20530
(202) 514-5776

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing was served upon the following counsel, electronically, on this 8th day of August, 2008:

Steven R. Kiersh
5335 Wisconsin Avenue, N.W.
Suite 400
Washington, DC 20015
*Counsel for Anderson Straker*

John J. Carney
Carney & Carney
601 Pennsylvania Avenue, NW
Suite 900 - South Building
Washington, DC 20004
*Counsel for Wayne Pierre*

Pleasant S. Brodnax, III
The Mills Building, Suite 400
1700 Pennsylvania Avenue, NW
Washington, DC 20006
*Counsel for Kevin Nixon*

Patrick M. Donahue
Donahue Law Firm
18 West Street
Annapolis, MD 21401
*Counsel f or Christopher Sealy*

_____/s/_____

Bruce R. Hegyi